VENABLE LLP
Richard J. Frey (SBN 174120)
  rjfrey@Venable.com
Tamany Vinson Bentz (SBN 258600)
  tjbentz@Venable.com
Witt W. Chang (SBN 281721)
  wwchang@Venable.com
2049 Century Park East, Suite 2300
Los Angeles, CA  90067
Telephone:   (310) 229-9900
Facsimile:   (310) 229-9901

Attorneys for Plaintiff
CTC GLOBAL CORPORATION

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CTC GLOBAL CORPORATION, a Delaware corporation,<br><br>             Plaintiff,<br><br>      v.<br><br>JASON HUANG, an individual; RULONG CHEN, an individual; JIANPING HUANG a/k/a JAMES HUANG, an individual; and DOES 1-15, inclusive,<br><br>             Defendants. | CASE NO. 2:17-cv-9067<br><br>**COMPLAINT FOR:**<br><br>(1) THEFT OF TRADE SECRETS;<br>(2) MISAPPROPRIATION OF TRADE SECRETS (CUTSA);<br>(3) BREACH OF FIDUCIARY DUTY;<br>(4) BREACH OF DUTY OF LOYALTY;<br>(5) BREACH OF CONTRACT; AND<br>(6) CORRECTION OF NAMED INVENTOR ON U.S. PATENT NO. 9,633,766<br><br>**DEMAND FOR JURY TRIAL** |

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

19036258

**VENABLE LLP**
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

Plaintiff CTC Global Corporation ("CTC" or "Plaintiff"), for its complaint against defendants Jason Huang ("Huang"), Rulong Chen ("Chen"), Jianping Huang a/k/a James Huang ("James Huang") and Does 1 through 15, inclusive (collectively, "Defendants"), alleges as follows:

## NATURE OF THE CASE

1. Plaintiff CTC entrusted defendant Huang (its CTO, former CEO, and board member) with the responsibility to manage a key joint venture project in China and to develop CTC's business relationships in China.

2. As set forth herein, unbeknownst to CTC until recently, Huang betrayed CTC's trust by using CTC's trade secret and proprietary information to establish and enable competitors of CTC; diverting investment and other partnership opportunities away from CTC and to himself; aiding his brother, defendant James Huang, to file patents on CTC's technology; and abusing his position at the joint venture to engage in self-dealing benefiting him and his family members, including his wife, defendant Chen, at the expense of CTC.

3. Chen aided and abetted her husband's malfeasance through her contemporaneous knowledge of his wrongdoing and by lending substantial assistance to his efforts.

4. James Huang aided and abetted his brother's malfeasance through his contemporaneous knowledge of Huang's wrongdoing and by lending substantial assistance to his efforts.

5. As a result of Defendants' conduct, CTC has suffered millions of dollars of damages, including in the form of lost profits, and Defendants greatly and unjustly enriched themselves and their family members at CTC's expense.

6. CTC is informed and believes that Huang's wrongful conduct along the lines described herein continues to this day, and CTC therefore continues to suffer harm.

19036258

## THE PARTIES

7.     Plaintiff CTC is a Delaware corporation with its principal place of business in Orange County, California.

8.     Plaintiff is informed and believes, and based thereon alleges, that defendant Jason Huang is an individual domiciled in Orange County, California.

9.     Plaintiff is informed and believes, and based thereon alleges, that defendant Rulong Chen is an individual domiciled in Orange County, California.

10.     Plaintiff is informed and believes, and based thereon alleges, that defendant James Huang is an individual domiciled in Markham, Canada.  Plaintiff is informed and believes, and based thereon alleges, James Huang is part owner of a U.S. company called FRP Resource Global Grid located at 2947 Calle Guadalajara, San Clemente, CA 92673,

11.     Plaintiff does not know the true names and capacities of the Defendants sued herein as Does 1 through 15, inclusive, and therefore sues these defendants by their fictitious names.  Pursuant to Federal Rules of Civil Procedure 15(a)(2) and 21, Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of Does 1 through 15, inclusive, when ascertained.

12.     Plaintiff is informed and believes, and based thereon alleges, that each of the named and fictitiously named Defendants, including Does 1 through 15, inclusive, are in some manner of law or fact responsible for the wrongs, damages and causes of action alleged herein, and that at all times referenced herein each was the successor, assign, joint venturer, co-venturer, co-conspirator, partner, agent or alter ego of the others, or was otherwise involved with the other Defendants in the wrongdoing averred herein, and by virtue of such capacity is liable and responsible on the facts alleged for some or all of the damages sought herein.

## JURISDICTION AND VENUE

13.     Subject matter jurisdiction is proper in this Court under 28 U.S.C. §§ 1331, 1338 and 1367.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

COMPLAINT

19036258

14.    The Court has personal jurisdiction over Huang because he is domiciled in California, worked in California for CTC, and committed many of the bad acts complained of herein while in California.  Additionally, Huang entered into one of the contracts subject to this action in California, and stipulated to venue and jurisdiction "in the courts of Orange County, in the State of California."

15.    The Court has personal jurisdiction over Chen because she is domiciled in California, worked in California for CTC, and committed many of the bad acts complained of herein while in California.  Additionally, Chen entered into one of the contracts subject to this action in California, and stipulated to the "exclusive jurisdiction and venue for any controversy in any manner relating to this Agreement . . . [in] the state or federal courts of Orange County, California."

16.    The Court has personal jurisdiction over James Huang because he intentionally and knowingly filed patent applications based on CTC technology, thereby, intentionally depriving CTC of ownership over the technology, which was developed by CTC in California.  James Huang purposefully registered a patent in the United States Patent and Trademark Office through his agent/attorney in Encinitas, California.  Further, upon information and belief, James Huang is part owner of the business FRP Resource Inc., which is located in San Clemente, California, and received payments from CTC to Chen.

17.    Venue is appropriate in Orange County, California because CTC's causes of action arose in Orange County, CTC's injury occurred therein, and CTC is headquartered in Orange County.

## FACTUAL BACKGROUND

### CTC and Its Proprietary Technology

18.    Plaintiff CTC is a company that specializes in the development, certification, and deployment of advanced technologies that electric utilities across the world use to improve the efficiency, capability, reliability, and resiliency of their electric power grids.

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

19036258

COMPLAINT

19. One of CTC's flagship products is ACCC™, which is a next-generation power line that is stronger, lighter, and more conductive than those used in traditional utilities grids.

20. ACCC™ utilizes a high-strength, light-weight composite core made up of carbon fibers, glass fibers, and resin to replace conventional steel core wires in conventional bare overhead conductors. The core used in ACCC™ offers a very low coefficient of thermal expansion to mitigate conductor sag under heavy electrical load conditions.

21. The core's greater strength and improved dimensional stability also enables increased spans between fewer and/or shorter structures to reduce costs and minimize environmental impact on new transmission lines. The light weight composite core further allows ACCC™ to incorporate up to 30% more conductive aluminum which not only helps increase line capacity, it also helps reduce line losses by 25 to 40% or more.

22. The technological innovations that enable ACCC™ to be manufactured, installed, and utilized are protected through CTC's filing of certain patents in the United States and in approximately 94 countries globally. While the aspects of ACCC™ that are patented may be public knowledge, the technology underlying ACCC™, specifically, the composition of the resin and process conditions used to manufacture ACCC™, are highly confidential trade secrets that belong to CTC. By varying the ratios of resin, carbon fiber, and fiberglass fiber in ways known only to CTC, CTC is able to deliver customized ACCC™ to its customers that can maintain maximum efficiency despite factors such as climate, terrain, environmental impact, and other site- and customer-specific considerations.[1]

---

[1] This intellectual property, and additional related technologies under development at CTC and referenced in this Complaint, are referred to collectively herein as the "CTC Technology."

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

19036258

23.     Moreover, since the first generation of ACCC™ was launched, CTC has invested massive amounts of time and effort to develop future generations of the product.  The technological innovations and processes underlying these projects under development are also trade secrets that belong to CTC.[2]

### Huang and Chen's Work At CTC

24.     Defendant Jason Huang is CTC's former Chief Executive Officer.  As part of his job as CEO, Huang was responsible for the oversight and management of all aspects of CTC's business, including business development, and personnel management, development of technology. Huang also spearheaded a joint venture to re-establish CTC's presence in China.

25.     Huang began his employment with CTC as its Vice President of Research and Development in May 2010.

26.     Incidental to his employment with CTC, Huang and CTC Cable Corporation, predecessor to CTC, entered into the Confidential Information and Invention Assignment Agreement ("Huang Agreement"), effective May 13, 2010. A true and correct copy of the Huang Agreement is attached hereto as Exhibit A.

27.     Defendant Rulong Chen is Huang's wife.  She was a CTC consultant pursuant to the Consultant Agreement between Chen and CTC, effective November 19, 2012 ("Chen Agreement").  A true and correct copy of the Chen Agreement is attached hereto as Exhibit B.  Payments to Chen under the Chen Agreement were paid to FRP Resource Inc.

28.     In 2014, Huang transitioned from CEO to Chief Technology Officer because he was better suited for the CTO position given his technical experience. Huang remained on the CTC board.  But Huang became disgruntled.  Rather than leave CTC, Huang secretly conspired with Chen to use CTC's trade secrets and

---

[2] CTC developed a new pretensioned cable concept.  Huang diverted this idea to his brother, Huang Jianping (a.k.a. James Huang), who patented it in 2015.  But for Huang's wrongful disclosure of this CTC idea, it would have remained secret, and CTC would have patented it.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

19036258

1   other confidential information to fast-track the development of competing ventures

2   in China, to usurp CTC's corporate opportunities, and to enrich themselves at

3   CTC's expense.

### The CTC-NARI Joint Venture

5     29. In 2014, CTC and a Chinese State-owned company, NARI Group

6   ("NARI"), established a joint venture in Jiangsu Province, China called Jiangsu

7   NARI CTC Composite Material Co., Ltd. (the "JV").  The purpose of the JV was

8   to combine CTC's technical expertise in manufacturing carbon fiber core and

9   conductor with NARI's expertise and connections in the Chinese electric utility

10  market.

11    30. On or around February 20, 2014, Huang was appointed by CTC to be

12  CTC's on-site representative at the JV and the General Manager of the JV.  He

13  concurrently held his role as CTC's CTO and remained on CTC's board.

14    31. In these roles, Huang spent half his time in China, and it was part of

15  Huang's job to develop relationships on behalf of the JV and CTC with

16  downstream companies in China, such as companies that could wrap the

17  strengthening core member with aluminum to form the final conductor that is sold

18  to CTC's customers and to customers of the JV.

19    32. Recently, CTC discovered that Huang took advantage of his position,

20  CTC's practical inability to directly oversee and supervise his activities in China,

21  and his unique knowledge of CTC's technology to divert CTC's intellectual

22  property to third parties in China, establish Chinese rivals to CTC, and divert

23  corporate opportunities belonging to CTC and the JV away from CTC and to

24  himself and his family members.

### Huang Secretly Established Xinbo Cable Using CTC Technology

26    33. While employed by CTC and sitting on CTC's board, Huang directed

27  and set up a direct competitor to CTC in the carbon fiber cable manufacturing

28  industry by illicitly disclosing CTC's trade secrets and other proprietary

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

6

19036258

information.  In exchange, Huang received initial public offering shares in the parent company of the CTC competitor he established, and directed that those shares be issued in his wife's name.

34.    In or around June 2014, the JV entered into a cooperation agreement with a company called Tianjin Xinbo Power Composite Insulator Manufacturing Co. Ltd. ("Xinbo"), a potential stranding partner based in Tianjin, China.  On information and belief, at that time, as it had been for many years prior, Xinbo was a manufacturer of insulator based on traditional technology, and had no wire production capability at all, much less the next-generation carbon fiber cable technology that CTC pioneered.

35.    Around the same time, unbeknownst to CTC, Huang sought a substantial amount of money from Xinbo in exchange for the capability to manufacture carbon fiber core and conductor, *i.e.* CTC's trade secret technology.

36.    Huang then disclosed and used technologies that he had become familiar with, and indeed, had participated in developing, as part of his work at CTC in order to set up Xinbo's carbon fiber core and conductor manufacturing capability.

37.    Xinbo has filed at least five patents on carbon fiber composite cores. For instance, on November 17, 2014, Xinbo filed a patent on "carbon fiber composite core wire applicable to voltage below 220kV."  On information and belief, Xinbo had no prior experience with or expertise in such technology. Moreover, the technology described in the patents is closely related to technology that CTC had developed and that Huang had worked on as part of his employment with CTC.

38.    The next month, Xinbo issued shares to Huang as part of Xinbo's initial public offering.  Huang instructed that the shares be put in his wife's name, making her one of the five largest shareholders in Xinbo at that time.  These shares are now worth many times the price at which they were originally issued.

V E N A B L E  L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

19036258

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

39.    In April 2015, Xinbo formally established a subsidiary, Tianjin Xinbo Special Cable Manufacturing Co., Ltd. ("Xinbo Cable"), to manufacture carbon fiber conductor core and stranded conductor.  Xinbo Cable is registered at the same address in Tianjin, China as its parent, Xinbo.

40.    Xinbo Cable's carbon fiber core and conductor was tested and certified by China Electric Power Research Institute (a prerequisite to market viability) in October 2015, and in February 2016, Xinbo Cable began manufacturing composite core conductor in competition with CTC.  Xinbo Cable's product is formally named "temperature transfer type carbon fiber composite material core overhead wire," and is also known as "TS" cable technology ("TS Cable").

41.    Xinbo Cable landed at least one lucrative government project described as "three-year new type of carbon fiber cable technology project" with the Shandong Electric Power Company ("Shandong State Grid"), a Chinese state-owned entity.  On information and belief, this project commenced in 2017, and Xinbo Cable is servicing this project by supplying the Shandong State Grid with TS Cable.

42.    Moreover, as a direct result of Huang's efforts, Xinbo Cable has registered at least five patents in China that are substantially related to CTC's patented carbon fiber technology and Huang's work at CTC and the JV.[3]  On information and belief, none of the listed inventors on these patents have any prior expertise in carbon fiber core conductor technology.

---

[3] These patents were for the inventions of "Novel wrap-around high energy efficiency carbon fiber wire of aluminum," "Strain clamp for carbon fiber leads," "Carbon fiber lead," "Novel carbon fiber lead," and a utility patent for "Novel hydraulic type strain clamp."

19036258

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

43.     Xinbo Cable's patents were filed by Tianjin Sanli Patent and Trademark Agency Co. Ltd., which was once used by Huang's brother, defendant Huang Jianping (a.k.a. James Huang) for a patent registration in 2016.

44.     From 2015 through 2016 (*i.e.* during the time period that Huang secretly aided in the establishment of Xinbo Cable), James Huang filed three patents closely related to CTC technology.[4]  These patents were transferred to Huang around April 2017.  Huang had also previously diverted technology conceived of at CTC to James Huang for the latter to patent.

45.     On information and belief, James Huang lacks the technical experience and expertise to have invented the technology behind these patents, and therefore, Xinbo was actually using the expertise and knowledge that Huang acquired from CTC to manufacture carbon fiber cables.

46.     Furthermore, on information and belief, with the aid of Xinbo, Huang also attempted to commercialize electrical grid software technology that he had worked on at CTC with two software development companies in Beijing.

47.     Thus, Huang was able to divert technology developed by CTC (or, at a minimum, in development for CTC under his supervision) to Xinbo, set up Xinbo's manufacturing capability, and then utilize Chinese patents to make it appear as if Xinbo had developed the technology and manufacturing capability in-house and not through the nefarious means described herein.

***Huang Failed to Inform CTC of A Corporate Opportunity, and Transferred CTC Technology to Jiangsu Yi Ding for Personal Gain***

48.     Jiangsu Yi Ding Electric Power Technology Company ("Yi Ding") manufactures carbon fiber composite materials.  Yi Ding has a contract with the

---

[4] These patents were for the inventions of "High efficiency lead for reducing heat inflection point and manufacture method," "Energy efficient wire with reduced thermal knee points and the related manufacturing method," and a utility patent for "Reduce high energy efficiency wire of hot flex point."

19036258

CTC JV in China.  This relationship was instituted based upon Jason's insistence that CTC do a deal with Yi Ding.

49.     In September 2014, Yi Ding and Huang co-invested in a project worth RMB 20 million relating to carbon fiber composite materials.  On information and belief, Xinbo was also a partner in this investment.  Huang failed to inform CTC of this opportunity though it was directly in CTC's wheelhouse.

50.     Several months later, Yi Ding filed four patents that claim ideas and/or technology that was conceived at CTC and, upon information and belief, disclosed to Yi Ding by Huang.[5]

51.     Additionally, under Huang's supervision, CTC had developed the application of using a certain carbon fiber compound to construct high performance conveyer belts.  The concepts and application of this conveyer belt technology were developed under Huang's direction and with CTC's funds.  While internally at CTC, Huang strongly discouraged the commercial development of this technology, citing profitability concerns, Huang simultaneously sought to secretly develop the same technology with Yi Ding.

52.     Indeed, in August 2015, Yi Ding's subsidiary, Jiangsu Yi Ding Composite Technology Co. Ltd. ("Yi Ding Composite") applied for a patent regarding the same technology Huang had recommended that CTC stop pursuing.

***Huang Enabled The Diversion of CTC Technology To Wuxi Huaneng To CTC's Detriment***

53.     Wuxi Huaneng Electric Cable Co. Ltd. ("Wuxi Huaneng") manufactures carbon fiber cables, predominately for export (*i.e.* sales outside of

---

[5] These patents were for "Medium-strength aluminum allow stranded wire splicing sleeve," "Medium-strength aluminum allow stranded wire strain clamp," "Aluminum alloy core high-conductivity aluminum stranded wire strain clamp," and "Aluminum allow core high-conductivity aluminum stranded wire splicing sleeve.'

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

COMPLAINT

19036258

China).  On information and belief, Huang had previously worked with, or had some other personal or professional connection, with Wuxi Huaneng.

54.     In 2016, Jason directed the JV to enter into a Strategic Agreement with Wuxi Huaneng that allowed Wuxi Huaneng to purchase core from the JV and export the resulting conductor to end users outside of China.  In doing so, Huang contravened CTC's agreements with NARI that require that the JV get CTC approval before selling core to third parties for export, and undermined CTC's ability to compete internationally.  Stated differently, Huang enabled Wuxi Huaneng to circumvent CTC and obtain CTC's core technology from the JV, and use it to compete with CTC on the international market.

### Huang Sought Investment From CTC's Partners Into Opportunities Not Presented To CTC

55.     In late 2014, Huang reached out to certain CTC business partners to join with him in a RMB 50 million (~$7.6 million) fund called the Zhujiang Investment Group ("Zhujiang Fund").  The Zhujiang Fund sought to invest in electric wire companies and patentable resin applications, *i.e.* the very industries in which CTC was engaged and the technologies that CTC had employed Huang to develop for CTC.

56.     Huang failed to disclose this opportunity to CTC.

### Huang Engaged In Self-Dealing By Abusing His Position At The JV

57.     The resin formulation that is used to create ACCC™ is confidential.  CTC provides resin for ACCC™ to the JV, which, by contract, was required to obtain all of its resin from CTC.  This arrangement was specifically intended to enable CTC to be able to control its trade secrets and knowhow within China.

58.     In September 2014, Huang forwarded CTC's proprietary resin formula to his nephew, Will Huang a.k.a Huang Jia Wei.

59.     Over the next year, Huang and his nephew travelled to Nantong, China many times.  On information and belief, Nantong is the same city where

11

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

19036258

Huang's younger brother, Huang Jianhua (and Will Huang's father), resides and owns a company.

60.     In December 2015, the JV, at Huang's direction, signed a contract for the production of a large quantity of resin to be fulfilled by a company called Langbo Nantong Business and Trade Co. Ltd. ("Langbo Nantong").  Up until that point, Langbo Nantong had no expertise in manufacturing resin, especially at the exact specifications required by the JV, which many experienced companies in China with whom CTC had previously interacted could not meet.

61.     Unbeknownst to CTC, Huang directed the JV to use the resin to manufacture carbon fiber composite core.

62.     Huang forced the JV to enter into a second consulting contract with his wife, defendant Chen, without disclosure to or the authorization of CTC.  Chen's work for the JV was essentially the same work she was already being paid to perform as an independent contractor of CTC pursuant to the Chen Agreement.

63.     All the travel and expenses Huang incurred to set up the illicit arrangements set forth herein were charged to and reimbursed by CTC.

### *James Huang Filed Patent Applications On CTC Technology*

64.     On September 23, 2015, James Huang filed U.S. patent application No. 14/863,396, titled "Energy Efficient Conductors With Reduced Thremal Knee Points And The Method of Manufacture Thereof."  This patent issued as U.S. Patent No. 9,633,766 (the "'766 patent") on April 25, 2017.  Attached hereto as Exhibit C is a true and correct copy of U.S. Patent No. 9,633,766.  James Huang is the sole inventor on the '766 patent.

65.     On March 3, 2017, James Huang filed U.S. patent application 15/449,602 (the "'602 application"), titled "Energy Efficient Conductors With Reduced Thermal Knee Points And The Method of Manufacture Thereof."  James Huang is the sole inventor named on this application.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

66.     The attorney and agent that prosecuted the '766 patent and '602 application on James Huang's behalf is located in Encinitas, California.

67.     The '766 patent claims an electrical conductor with a strength member that is under tensile strain and the conductor is free of tension.  This concept of pre-stressing the strength member of a conductor was considered by CTC as early as 2012 and continued for several years.  CTC considered several projects that included pre-stressing a strength member, all of which were kept confidential and considered a trade secret by CTC.  Huang was involved in these projects and, upon information and belief, shared CTC's confidential trade secret information about pre-stressing a strength member with his brother James Huang so that James Huang could file a patent on CTC's technology.  As a result, the '766 patent includes the ideas and inventive contributions of CTC employees, Eric Bosze, Doug Pilling and/or Huang.  These CTC employees contributed to the conception and/or reduction to practice of inventions claimed in the '766 patent.

68.     Likewise, the '602 application claims the manufacturing process for a strength member that is under tensile strain while the conductor is free of tension.  Claims of the '602 application include inventive contributions by Doug Piling, Eric Bosze and/or Huang.  These CTC employees contributed to the conception and/or reduction to practice of inventions currently claimed in the '602 application.

69.     On August 12, 2011, Eric Bosze and CTC entered into a Confidential Information and Invention Assignment Agreement ("the Bosze Agreement").  In the Bosze Agreement, Mr. Bosze assigned all his right, title and interest in and to all of his "Subject Ideas and Inventions" to CTC.  The "Subject Ideas and Inventions" is defined to include Mr. Bosze's ideas and inventions relating to pre-stressing a strength member in a conductor, including those ideas and inventions claimed in the '766 Patent and '602 application.

70.     On August 15, 2011, Doug Pilling and CTC entered into a Confidential Information and Invention Assignment Agreement ("the Pilling

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

13

Agreement"). In the Pilling Agreement, Mr. Pilling assigned all his right, title and interest in and to all of his "Subject Ideas and Inventions" to CTC. The "Subject Ideas and Inventions" is defined to include Mr. Pilling's ideas and inventions relating to pre-stressing a strength member in a conductor, including those ideas and inventions claimed in the '766 Patent and '602 application.

71.     In the Huang Agreement, Huang assigned all his right, title and interest in and to all of his "Subject Ideas and Inventions." The "Subject Ideas and Inventions" is defined to include Huang's ideas and inventions relating to pre-stressing a strength member in a conductor, including those ideas and inventions claimed in the '766 Patent and '602 application.

***CTC's Investigation, and Huang's Spoliation of Evidence and Termination***

72.     In late 2016, NARI alerted CTC to the possibility that Huang may be engaged in conduct competitive with the JV.

73.     Shortly thereafter, CTC commenced an investigation into Huang's activities in China.

74.     When evidence of Huang's wrongdoing came to light, CTC suspended Huang's employment with pay in the hopes that Huang would cooperate with CTC's investigation.

75.     CTC requested that Huang return his company laptop and iPad for inspection, but Huang delayed, and attempted to wipe the company devices of all data. Only with the aid of a forensic investigator was CTC able to obtain some information from these CTC devices. In part due to this spoliation of crucial evidence, the full extent of Huang's wrongful conduct in China has yet to be discovered, and may never be discovered.

76.     Subsequently, CTC suspended Huang without pay, and on February 3, 2017, CTC terminated Huang's employment.

77.     In recent months, Huang has approached multiple CTC customers and clients seeking to sell product based upon the CTC Technology.

**V E N A B L E   L L P**
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

14

19036258

# FIRST CAUSE OF ACTION

## THEFT OF TRADE SECRETS

### 18 U.S.C. § 1832 *et seq*.

(As to All Defendants)

78.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

79.     At all relevant times, CTC owned the CTC Technology.  CTC Technology relates to ACCC™, which is sold worldwide.

80.     The CTC Technology derives independent economic value from the fact that significant portions of the technology are not generally known to the public or to other persons who can obtain economic value from its disclosure or use.

81.     CTC takes reasonable efforts under the circumstances to maintain the secrecy of the confidential portions of the CTC Technology, including by contracting to be the sole provider of resin to the JV; entering into confidentiality agreements with its key personnel, such as Huang; only disclosing its resin formula to those with a need to know and those who have signed confidential agreements; re-labeling resin components to remove vendor traceability, pre-mixing critical components to preclude disclosure of formula; and enforcing its rights through litigation when its trade secrets are threatened.

82.     CTC granted defendant Huang, as CTC's CEO and CTO, access to the CTC Technology solely for the purpose of fulfilling his responsibilities to CTC and the JV.

83.     As set forth herein, Huang acquired, disclosed, and used the CTC Technology through improper means and in violation of the confidentiality obligations owed to CTC on many occasions and in connection with many different third parties.  For instance, Huang illicitly acquired the CTC Technology by accessing and possessing it for reasons outside the scope of why he was

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

19036258

permitted by CTC to access and possess it.  Huang disclosed and used aspects of the CTC Technology in order to set up a competitor to CTC while simultaneously working for CTC.  Huang also disclosed CTC's proprietary resin formula to a third party without CTC's permission or consent.

84.     Defendant Chen aided and abetted Huang's trade secret theft because she had contemporaneous knowledge of his wrongful conduct, substantially assisted Huang in committing the wrongful conduct, and had the specific intent to facilitate the wrongful conduct.  Chen is therefore liable for the wrongful conduct she aided and abetted.

85.     Defendant James Huang committed trade secret theft because he had contemporaneous knowledge of his brother's wrongful conduct.  Nevertheless acquired and publicly disclosed CTC Technology with knowledge that Huang was disclosing the CTC Technology in violation of his confidentiality obligations to CTC.

86.     As a direct and proximate result of Defendants' wrongful conduct, CTC has suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

## MISAPPROPRIATION OF TRADE SECRETS

### California Uniform Trade Secrets Act

(As to All Defendants)

87.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

88.     At all relevant times, CTC owned the CTC Technology.

89.     The CTC Technology derives independent economic value from that fact that significant portions of the technology are not generally known to the public or to other persons who can obtain economic value from its disclosure or use.

16

90.     CTC takes reasonable efforts under the circumstances to maintain the secrecy of the confidential portions of the CTC Technology, including by contracting to be the sole provider of resin to the JV; entering into confidentiality agreements with its key personnel, such as Huang; only disclosing the resin formula to those with a need to know and those who have signed confidential agreements; and enforcing its rights through litigation when its trade secrets are threatened.

91.     CTC granted defendant Huang, as CTC's CEO and CTO, access to the CTC Technology solely for the purpose of fulfilling his responsibilities to CTC and the JV.

92.     As set forth herein, Huang acquired, disclosed, and used the CTC Technology through improper means on many occasions and in connection with many different third parties.  For instance, Huang illicitly acquired the CTC Technology by accessing and possessing it for reasons outside the scope of why he was permitted by CTC to access and possess it.  Huang disclosed and used aspects of the CTC Technology in order to set up a competitor to CTC while simultaneously working for CTC.  Huang also disclosed CTC's proprietary resin formula to a third party without CTC's permission or consent.

93.     Defendant Chen aided and abetted Huang's trade secret misappropriation because she had contemporaneous knowledge of his wrongful conduct, substantially assisted Huang in committing the wrongful conduct, and had the specific intent to facilitate the wrongful conduct.  Chen is therefore liable for the wrongful conduct she aided and abetted.

94.     Defendant James Huang committed trade secret misappropriation because he had contemporaneous knowledge of his brother's wrongful conduct. Nevertheless acquired and publicly disclosed CTC Technology with knowledge that Huang was disclosing the CTC Technology in violation of his confidentiality obligations to CTC.

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

19036258

95.     As a direct and proximate result of Defendants' wrongful conduct, CTC has suffered damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

(As to Huang and Chen)

96.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

97.     At all relevant times, Huang owed CTC a fiduciary duty.  Huang served as a board member for CTC, was CTC's CEO and subsequently, its CTO. Regardless of Huang's title, however, Huang participated in management with discretionary power to manage CTC's corporate affairs.

98.     As set forth herein, Huang breached the fiduciary duties he owed to CTC through his wrongful conduct, including by setting up Xinbo Cable's carbon fiber cable manufacturing capability in competition with CTC; usurping CTC's corporate opportunities by participating in the development of intellectual property and then diverting it away from CTC; diverting lucrative investment opportunities away from CTC; forcing CTC's JV to purchase resin from a third party to whom he had transferred CTC's proprietary resin formula; and destroying company information, including evidence of his wrongful conduct, through the spoliation of his company devices.

99.     Defendant Chen aided and abetted Huang's breach of fiduciary duty because she had contemporaneous knowledge of his wrongful conduct, substantially assisted Huang in committing the wrongful conduct, and had the specific intent to facilitate the wrongful conduct.  Chen is therefore liable for the wrongful conduct she aided and abetted.

100.    As a direct and proximate result of Defendants' wrongful conduct, CTC has suffered damages, including lost profits, in an amount to be proven at trial.

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

COMPLAINT

19036258

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

# FOURTH CAUSE OF ACTION

## BREACH OF DUTY OF LOYALTY

### (As to Huang and Chen)

101.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

102.    At all relevant times, as a high level CTC employee and board member, Huang owed CTC a duty of loyalty.

103.    As set forth herein, Huang breached the duty of loyalty he owed to CTC by taking actions inimical to CTC's best interests, including by entering into the Wuxi Huaneng Strategic Agreement in violation of the agreements CTC had with the JV and enabling Wuxi Huaneng to directly compete with CTC internationally; directing the JV to purchase the resin from Nanbo Lantong and then using it to manufacture composite core; ordering the JV to enter into a consulting contract with Chen without the proper authorization or disclosure to CTC; and destroying company information, including evidence of his wrongful conduct, through the spoliation of his company devices.

104.    Additionally, the conduct set forth herein constituting breach of fiduciary duty also constitutes breach of the duty of loyalty.

105.    Defendant Chen aided and abetted Huang's breach of the duty of loyalty because she had contemporaneous knowledge of his wrongful conduct, substantially assisted Huang in committing the wrongful conduct, and had the specific intent to facilitate the wrongful conduct.  Chen is therefore liable for the wrongful conduct she aided and abetted.

106.    As a direct and proximate result of Defendants' wrongful conduct, CTC has suffered damages in an amount to be proven at trial.

///

///

19

19036258

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

## FIFTH CAUSE OF ACTION

## BREACH OF CONTRACT— CONFIDENTIAL INFORMATION AGREEMENT

(As to Defendant Huang)

107.   Plaintiff incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

108.   CTC's predecessor and Huang entered into the Huang Agreement, effective May 13, 2010.

109.   CTC and its predecessor have fully performed, and at a minimum, have substantially performed, all conditions, covenants, obligations and promises required on their part to be performed in accordance with the Huang Agreement.

110.   Sections 2(c), 2(d), and 3(b) of the Huang Agreement require Huang to refrain from disclosing CTC's confidential information to third parties, to return CTC's information to CTC upon the termination of his employment, and to assign his rights to ideas and inventions occurring during his employment with CTC to CTC, respectively.

111.   As set forth herein, apart from the theft of trade secrets set forth above, Huang breached these provisions by his conduct including the following: Instead of refraining from disclosing CTC's confidential information to others, Huang set out to monetize the CTC Technology by working with multiple third parties, including Xinbo and Xinbo Cable, to create companies competitive with CTC and to take advantage of lucrative investment opportunities for himself as CTC's expense.  Instead of returning CTC's information to CTC, Huang attempted to wipe the information from his CTC devices (and successfully did so with respect to at least one device).  Instead of assigning his rights to ideas and inventions he was a part of by virtue of his affiliation with CTC, Huang diverted them to third parties, including his brother.

19036258

112.   As a direct and proximate result of Huang's wrongful conduct, CTC has suffered damages in an amount to be proven at trial.

113.   Additionally, Section 14 of the Huang Agreement provides that "Should either I or the Company, or any heir, personal representative, successor or permitted assign of either party, resort to legal proceedings to enforce this Agreement, the prevailing party (as defined in California statutory law) in such legal proceeding shall be awarded, in addition to such other relief as may be granted, attorneys' fees and costs incurred in connection with such proceeding.

114.   Therefore, CTC is also entitled to its attorneys' fees and costs incurred in connection with this proceeding.

## SIXTH CAUSE OF ACTION

## CORRECTION OF INVENTORSHIP

### (As to Defendant James Huang)

115.   Plaintiff incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

116.   This cause of action arises under Section 256 of the Patent Act, 35 U.S.C. § 256.

117.   The '766 patent lists James Huang as the sole inventor.

118.   In fact, former CTC employee, Huang, and current CTC employees, Eric Bosze and/or Doug Pilling, contributed to the invention of the subject matter disclosed and claimed in the '766 patent and should have been named as inventors. Mr. Bosze and Mr. Pilling, for instance, co-invented at least claims 3, 5, 8, and 12 of the '766 Patent.

119.   The omission of Huang, Mr. Bosze and/or Mr. Pilling from the '766 patent was erroneous.

120.   CTC has ownership rights in the '766 Patent by virtue of the assignment of rights from Huang, Mr. Bosze and Mr. Pilling.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

COMPLAINT

19036258

121.   The omission of Huang, Mr. Bosze and Mr. Pilling as inventors on the '766 patent has injured CTC by depriving it of an ownership interest or financial stake in the patent, which can be redressed by correction of inventorship.

122.   In addition, CTC has a financial interest in correcting inventorship. As the rightful assignee of the '766 Patent, CTC has a vested interest in preventing its patent rights from being extinguished by incorrect inventorship.  More specifically, if inventorship is not corrected the patent is at risk for being proven invalid.  If that were to occur, CTC would lose its rights to enforce the patent against infringers.

123.   Mr. Bosze and Mr. Pilling had notice of this action and have consented to this action to correct inventorship.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.   An award of actual, compensatory, exemplary and unjust enrichment damages against Defendants in an amount according to proof at trial;

2.   An award of punitive and exemplary damages in an amount sufficient to punish and make an example of Defendants in an amount according to proof at trial;

3.   Declaration directing the USPTO to correct inventorship of the '766 patent;

4.   An injunction to prevent the theft or use of CTC's trade secrets;

5.   All costs of suit incurred herein, including attorneys' fees;

6.   Pre- and post-judgment interest at the maximum legal rate; and

7.   Any and all further relief which the Court deems just and proper.

Dated:  December 18, 2017           VENABLE LLP

                                    By:  /s/ Tamany Vinson Bentz
                                         Tamany Vinson Bentz

                                    Attorneys for Plaintiff
                                    CTC GLOBAL CORPORATION

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

22

19036258

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  December 18, 2017

VENABLE LLP

By:  /s/ Tamany Vinson Bentz
      Tamany Vinson Bentz

Attorneys for Plaintiff
CTC GLOBAL CORPORATION

COMPLAINT

19036258